In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-25-00232-CV**

_____

**IN THE INTEREST OF M.C. and J.R.**

**On Appeal from County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 24-05-07582**

**MEMORANDUM OPINION**

This appeal arises from a judgment terminating Mother's and Father's parent-child relationships with their two children, following a jury's affirmative findings on predicate grounds and best interest. The two children in question and discussed in the appeal are James and May (collectively "the Children").[1] While they share the same mother, that is not true of their respective fathers. Mother appeals from a

---

[1]To protect the identity of the children, we use a pseudonym to refer to the children and the parents. *See* Tex. R. App. P. 9.8(b)(2).

judgment terminating her rights to James and May, and Father appeals from a judgment terminating his rights to James only.[2]

The trial court found, by clear and convincing evidence, statutory grounds exist for termination of Mother's and Father's parental rights and that termination of their parental rights would be in the children's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D)(E)(P), (2). Both Mother and Father challenge the legal and factual sufficiency of the evidence to support the best interest finding. In three separate issues, Mother challenges the denial of her Motion to Retain and for Extension of Dismissal Deadline, granting of May's Alleged Father's Motion for General Extension and to Set New Dismissal Date and severance of May's Father's case, and the appointing of the Department as permanent managing conservator of the Children.

As more fully discussed below, we affirm the trial court's Order of Termination as to Mother and Father.

## Background

In May 2024, the Department of Family and Protective Services ("the Department") filed a petition to terminate Mother's and Father's parental rights to the Children. The Department supported its petition with the affidavit of its

---

[2]The action to terminate May's father's parent-child relationship was severed from this case and is not part of this appeal.

investigator, Eric Aponte ("Aponte"). Aponte's affidavit set out the information leading to the Children's removal.

According to Aponte's affidavit, the Department received an initial referral alleging the neglectful supervision of the Children. The report stated that Father was in the hospital for attempted suicide, and that he would go on "shooting rampages, shooting cars and landlord[']s property" while leaving the Children unattended in the camper they lived in. The report further indicated that the Children were left unattended in the camper for hours at times, and Father and Mother were believed to consume methamphetamines and cocaine in the Children's presence.

The report further stated that the camper was unclean and that the shower in the camper was inoperable. Additionally, Aponte stated that there was domestic violence in the home, May intervened in the fights, Mother has failed to seek medical treatment for May, Mother withdrew May from school, and Mother and Father drove around the country to evade the Department's investigation.

The report indicated that Aponte went to the property where he observed James, in a dirty diaper, and James's chest, hands and face were dirty. May had recently returned from school and was clean and in clean clothes. Aponte spoke with Mother and she denied the allegations, and she refused to allow the Children to be

interviewed. Aponte spoke with Father, who denied the shooting and drug abuse, although he acknowledged a physical altercation in December 2023.

The report indicated that Aponte and his supervisor observed the residence from the outside and through the windows, and noted the residence consisted of two travel trailers connected. It appeared water was leaking from the underside of the trailers, and parts of the bottom of the trailers were hanging. They observed the interior ceiling coming down in one trailer, and both had tarps over the top. The interior was filled with trash, and the bed observed in one of the trailers had no sheets. [1CR31] A dog leash hung from the ceiling, and it had a foul odor. The report stated that the conditions of the home posed a threat for the overall health and safety of the Children.

**Trial Evidence**

The jury trial on the termination of Mother's and Father's parental rights began in May 2025.

May Nichols, the Department's supervisor of this case, testified that the investigator was Eric Aponte. Nichols stated that Aponte was fairly new to the Department and had not done removals before, so she assisted and supervised him closely on this case.

4

According to Nichols, the allegations in this case were neglectful supervision. She explained that Aponte went to the home first and photographed the Children. After seeing the photos, she had concerns about the cleanliness of the Children and the environment that was visible. Aponte returned to the home, with Nichols, to speak with the family and see if they would cooperate with the Department. However, the family was unwilling to cooperate, so the Department decided to seek the Children's removal, and it was granted.

On the day of removal, both parents admitted to methamphetamine use days prior, but they still seemed to be under the influence. Nichols testified that the Children were with a caregiver, and when she returned the Children, the caregiver also appeared under the influence. Once removed, the Children were placed with Dustin Tinlin, Father's brother.

Tyler Hall, a sergeant with the Montgomery County Sheriff's Office, testified that he is familiar with Father following a traffic stop in 2019. Hall stopped Father for a traffic violation and during the stop while Hall was at his patrol car, Father ran from the car. Hall pursued and eventually called for assistance from other units, but they initially could not locate Father. Father was eventually arrested, though he tried to run away again, so he was arrested for the active warrants and evading on foot.

Caleb Reitzel, a lieutenant with the Precinct 1 Constable's Office testified that he is the Lieutenant over the crisis intervention mental health unit and the civil division. Reitzel testified that the crisis intervention health unit responds to calls about threats of suicide, suicide, attempted suicide, and other calls related to mental health diagnosis. In addition to his peace officer training, he received special training to respond to crisis intervention calls. He explained that he is trained in evaluating if someone should be subject to an emergency detention order based on the person's actions.

Reitzel testified that he recalled meeting Mother and Father on the night of May 13, 2024, a time he was working as a sergeant on night shift over the crisis intervention mental health unit. When he arrived, he saw two children, a large pile of trash, a single-story residence that was on fire, two RVs facing each other, and trash throughout the yard. He noted that a machete was on the ground along with a spent shotgun shell casing among other trash. Reitzel's body camera video of the incident was admitted into evidence and played. Reitzel testified that Mother poured water on Father and in retaliation, Father busted the window of the truck. Father stated that "he wasn't handicapped but mentally, maybe."

Reitzel testified that Mother was being "kind of erratic" and based on her appearance and movements, it was his experience this indicated he was dealing with

6

someone that uses narcotics. He said the safety hazards included the glass all over, the unsheathed machete lying on the ground between the two trailers, and the home's cluttered condition.

Katie McKinney, a teacher at Creighton Elementary testified that she was May's second-grade teacher. McKinney testified that she was concerned about May's medical issue as her documents indicated that she suffered with asthma, and May was often absent with upper respiratory illnesses. May had thirty-four absences that year.

McKinney indicated that May's clothes were not always clean, and her shoes were typically falling apart, though she was dressed appropriately for the weather. McKinney testified that she could hear May wheezing, and she coughed a lot. She was concerned once when May struggled to breathe and left in an ambulance but returned to school the next day with no medicine. May was still wheezing and coughing a lot.

Despite her absences, McKinney testified that May did well in school, though she frequently argued with other students. With McKinney one-on-one, May was a sweet child.

Marcela French, a former nurse at Creighton Elementary, testified that she is a fourteen-year registered nurse and worked at Creighton for two years. French

recalled caring for May during her time at Creighton particularly on April 13, 2023, when May was in respiratory distress. French indicated that May was pale and had labored breaths and was having a hard time breathing. French's notes indicated the same, and included that May stated that she had been coughing all morning and had wheezing with coarse crackles. Her notes indicated that Mother was contacted but did not have a ride to the school, and Mother was informed that EMS was being called. French monitored May's oxygen level, and while a normal oxygen level is between 95 to 100%, May's oxygen level at its lowest was 87%. The ambulance came, and May was given medication and oxygen, then they took her to the hospital.

French testified that she was surprised and concerned to see May the next day because she had not heard from Mother about the hospital visit's outcome, and she did not receive any medication if May needed it during school. French's notes indicated that May was sent to the nurse's office again due to wheezing, coughing and retractions. The notes indicated that Mother was contacted and stated that May was diagnosed with bronchitis, was on a steroid, and that Mother would pick up her inhaler. Although Mother stated that emergency room medical providers indicated that May could return to school, French informed Mother of the need for medical clearance before returning to school. Mother stated that the emergency room informed her that May would be wheezing for a while and that she is okay. French

8

informed Mother that May was not medically stable to be at school due to retractions and her oxygen level. Mother indicated that she would take May for another evaluation and bring the necessary paperwork. Father picked up May from school and informed French that May does not have an inhaler due to not needing one. The notes indicated that Father was given an asthma plan and informed he should give it to the physician. Father indicated that he understood.

Medical records from May's April 13, 2023 hospital visit were admitted as evidence and French testified that the records indicate that May was prescribed an albuterol inhaler. French testified that after sending May home, May was withdrawn from school.

French testified that she saw May this school year at a different school and that May looked healthy, well taken care of, and there was a brightness to her eyes. French indicated that she was concerned when May was withdrawn from school because she did not know who would care for May. May has had asthma incidents this year, but she had an inhaler and an action plan, and she did not have trouble getting her care.

Father testified that he is James's father and that Tinlin is Father's half-brother. He indicated that May is Mother's daughter, though he has been in the role of stepdad since she was six years old. Father testified that the Children had been

9

living in terrible conditions, and they could have gotten hurt. He acknowledged that James is currently staying with Mr. Hailey, and that Mr. Hailey and Tinlin will keep James and May safe.

Father acknowledged that he has a substance abuse history that started when he was fourteen when he used amphetamines or methamphetamines. He testified that he had "one dirty" urinalysis when he used methamphetamine but denied using cocaine during this case. Father understood that using drugs creates a risk for children such as putting them in bad environments and having hazardous things around.

Father testified that he started substance abuse therapy but does not know if he was unsuccessfully discharged. He stated that his completion of individual counseling is "debatable" because his contract said that he had to go to counseling for three to six months, but he stopped going after nine months. Even though it says that he did not complete counseling, he stated that he went longer than he was supposed to.

Father testified that he was arrested a few weeks before trial for an October 2024 assault. He also acknowledged that he had seven tickets but has been paying them off and he believed only three remained. Evidence of Father's criminal history was admitted into evidence. Father testified that he was arrested on May 4, 2016, for

aggravated assault with a deadly weapon, a firearm. Father did not recall anything about the arrest and does not think he was under the influence. He was given deferred adjudication as punishment. He acknowledged that the document states that in March 2017, a motion to adjudicate Father was filed because he committed an assault with bodily injury, but he denied that it was correct. He stated that the document also indicates that he admitted smoking marijuana and failed to submit to urinalysis. At the time, Father's conditions were amended to add more counseling sessions, and the document indicates that in April 2019, a motion to adjudicate Father was filed because he was not following the rules. Father testified that he does not recall these details but confirmed this is what the document states. The document also indicates that Father violated the terms of his community supervision, committed an offense in Killeen, admitted to marijuana use, failed to submit to urinalysis, failed to go to Alcoholic Anonymous meetings ordered by the Court, and failed to complete substance abuse counseling. In response, Father stated, "Correct. I guess."

Father agreed that his conditions were amended again to add substance abuse counseling and additional community service hours. Father recalled the State moved to adjudicate him again but does not remember why. He acknowledged that he was sentenced to prison but went to the Substance Abuse Felony Punishment Facility

11

(SAFPF) for about nine months for drug treatment. Father indicated that he was sober for two or three years thereafter.

Father stated that he did not recall being charged with possession of methamphetamine, and he did not recall Officer Crowder arresting him for it. The document indicated that the charge was dismissed but he did not recall if it was dismissed as part of a plea bargain when he was convicted in another case.

Father did not recall if he was convicted of evading arrest in 2019 as Officer Hall testified or if he completed twelve hours of community service. He acknowledged that the document indicates that he was charged with assault on March 17, 2019.

According to Father, except for the assault, theft, and warrant for tickets, he has not been arrested since James was born in 2022. Father testified that he has been trying to make better choices since James was born, and his criminal history reflects his efforts.

Father testified that he believed that upon completion of the service plan, he would get unsupervised time with the Children for hours or weekends. Father indicated that his service plan required that he show proof of income, including any government assistant programs and proof of housing. Father stated that he eventually provided his caseworker with proof of government assistance. Father indicated that

he receives $1,000 monthly under disability, which he started receiving halfway through this case. Father also indicated that he provided a copy of his lease and utility bills from the home that he lives in with Mother. Together, they can pay rent and utilities. Father admitted that he received a lump sum of $11,000 in back pay, though he did not give any money to the caregivers to help support the Children. Father stated that he put a little over $3,000 in an SRP stock account.

Father indicated that he communicates with his caseworker regularly and takes random drug tests. Father stated that he last took a drug test a week or two ago, but he had not received the results. Father testified that he completed a substance abuse assessment, and it was recommended that he enroll in group drug counseling. He testified that he is in HEROES, as part of his sobriety plan, and he gets counseling and talks to others who are struggling. He could not recall who he is working with at HEROES and believed he has had three individual sessions. He did not know if the person he works with is a licensed professional counselor, and he admitted to attending group sessions.

Father admitted that he was required to attend individual counseling, but he stopped attending around the time of the death of his mother; but he still sees a therapist in the HEROES program. He testified that he completed the psychological evaluation and parenting classes.

Father testified that it was difficult for him to clean the property where he and the Children lived because he had a broken leg and he admitted to using drugs at the time. Father explained they had two trailers because he "wasn't living right" and used one as "a clubhouse" to keep drugs and bad things away from the Children. Father admitted that he smokes cigarettes and vapes but claimed he only does so outside and is at least twenty to thirty feet away from May. He acknowledged it would be best to stop smoking in front of her altogether.

Father testified that James is happy, and he wants James at his home or to have some rights to him. He indicated that he would do what is necessary to meet James's emotional needs, including enrolling him in therapy.

Father testified that when he was fourteen, his biological dad gave him drugs and used drugs with him. Father confirmed that he dropped the Children off to his father in May 2024. He acknowledged that he did not seek help for depression until the Department removed the Children.

Father testified that he had two girlfriends since this case started and has lived in four different places. He admitted that leaving a machete, shell casings, and broken glass around was not in the best interest of James and May. He agreed that leaving the Children with someone displaying erratic behavior is also not in the Children's best interest. He testified that though he does not want to lose his parental

14

rights, he did state that relinquishing them might be in the Children's best interest, out of fear they would go to a foster home.

Father testified that it took approximately three to four months for the property with the two trailers to look the way it did in the photos when the Children were removed. He admitted that May is likely traumatized by the living conditions at the trailers. Father stated that to address May's trauma issues, he is in favor of her seeing a therapist, but he does not believe that James needs a therapist. While Father acknowledged that he needed to quit smoking and that smoking and asthma do not go together, he prioritized quitting drugs and getting sober though he plans to quit smoking. Father admitted smoking one to two packs of cigarettes a day depending on his stress level.

Father testified that his relationship with Mother's father was consistent, and they celebrated James's birthday and Christmas at his home. He stated while in therapy with Victor Love, they addressed his temper, anger management, and drug use. He attended sessions with Love individually and with Mother. Together, Mother and Father worked on getting along and how to deal with problems. Father testified that Love terminated him after he missed two sessions while planning a funeral.

Father stated that when May was withdrawn from school following her hospital visit, she was enrolled in school online. During this time, they went on a

two-month, cross-country road trip and they received a letter from the Department. Although Father is currently receiving treatment at HEROES, he started at RCD Services but was unsuccessfully discharged for not attending sessions and not paying attention. Father admitted to starting treatment again one month before trial.

Father testified that he visited with the Children once a week for an hour and they paint, do puzzles, go to the children's museum or places like Main Event and Dave & Buster's. He brings snacks for the Children, along with diapers and wipes for James and helped potty train him.

Father stated that he has worked for Mr. Hailey on and off since he was released in 2020 and during this case. That work accounted for some income that he reported to the Department. Father indicated that he has had contact with James and May outside of the Department but did not tell the Department that.

Father described a motorcycle accident where he hit his head and dislocated his jaw. He stated that he was traveling sixty mph, and he was hit by a vehicle going eighty mph. He was wearing a helmet but has had memory issues since the accident.

To get the Children back, Father stated that he is participating in the HEROES program and has the support of his family to stay sober, including the support of Mother. He admitted that he does not have a relapse prevention plan.

Randy Crowder, a peace officer and deputy for Montgomery County Constable Precinct 4 testified that he is familiar with Father based on an encounter on June 26, 2019. Crowder stopped Father while he was on a motorcycle after Father crossed four lanes without signaling. Crowder got the impression that Father was going to run from him. During the stop, Father was arrested for possessing methamphetamine.

Victor Wayne Love, Mother's and Father's individual and family counselor, testified that both were referred to him through the Department. He testified that he is a licensed marriage and family therapist, a licensed chemical dependency counselor, and a licensed sex offender treatment provider. Love testified that Father was referred to him by the previous caseworker and he started individual counseling on June 12, 2024. He first saw Mother on October 11, 2024, and then both as a couple the same day.

Father attended twenty-two sessions and missed ten. Mother attended ten individual sessions and missed five. They participated in seven family sessions and were no-shows for three. He last saw them both on March 11, 2025. Love testified that throughout the case he felt as if he had to chase both parents to make sure they would attend. He stated that he texted and called them "quite a bit" and at the end of February, the caseworker informed him that they no longer wanted to meet with him

in therapy. Love indicated that he reached out to Mother and Father about them no longer wanting therapy with him. Father did not reply, and Mother stated that she wanted to continue therapy with her previous individual therapist, but that they would attend family therapy with him. Love noted that Mother and Father were discharged after not making much progress towards their therapy goals.

Love testified that he observed visits between the parents and the children and described Father as "hot and cold." There were times that Father was very playful with the Children, and other times he sat back or laid on the couch and was uninvolved.

Love testified that Mother was more active during the visits, but on several visits Mother and May would lie on the floor, and Mother would try to whisper to May. The caseworker stopped this because the parents may be trying to discuss inappropriate things. Love observed five visits, and at all five visits, May began to cry but Love did not recall any event or action preceding May crying. James was a typical toddler but did not seem to like being held by Mother or Father.

Love stated that Mother admitted that the behavior that brought the Children into the Department's care was her and Father's use of methamphetamine, being in an area where people used drugs, arguing a lot with Father, and possessions being broken during the arguments. Father reported the same and added that he argued

with neighbors when they came over and stole his possessions. Father admitted that Mother broke a lot of things like TVs, and that he hit her car with a hammer and threw a container of water through the windshield that made a hole in the windshield. Mother and Father did not accept responsibility for the Children's living conditions. Instead, they blamed it on an April 2024 flood. Father admitted they would leave the Children alone for ten to fifteen minutes to run to the corner store.

Love testified that Father indicated that during an argument with Mother that Father put all her prescription medication in his mouth to scare her as if he was trying to kill himself. Father indicated that he spit the pills out, but Mother did not know, and she called the police to get him help. Love testified that Father stated that he was using marijuana, alcohol and nicotine by the age of twelve, and used methamphetamine and cocaine by fourteen. Father indicated that by the age of sixteen he was a full-time drug dealer making $700-$1,500 a week. Father indicated that he did not consider marijuana a drug because it calmed and relaxed him. Love stated that Father indicated that he did not have the same attitude about drugs as other prisoners while in prison, because his intent was either to return to prison and/or continue to use drugs. Father further indicated that he first used heroin and a synthetic marijuana while at a halfway house.

19

Love testified that Mother spoke about dating a man ten years older than her when she was fourteen, finding her mother deceased after she had been deceased for about a month, and she spoke of being sexually assaulted after being given a date rape type of drug.

Love stated that Mother reported using drugs early on during this case, but not during the time she was working with Love. Mother admitted that she liked using a certain type of marijuana. Love stated that he reviewed Mother's psychological evaluation, and he did not see anything that would make her a candidate for medical marijuana. Love confirmed that Mother was in substance abuse treatment with the HEROES program.

Love recalled one instance where the parents were untruthful with him. According to Love, Mother and Father arrived for a session and he saw them eating in the car. Father later asked to be excused from his therapy session claiming that neither had eaten and were hungry.

Love testified that Father told him several times that he started substance abuse treatment, but Love found it was untrue. Between June and March, Father indicated that he started treatment at least five times. Though Father said on several occasions that he preferred a clean home and vehicle, Love testified that his vehicle was dirty, cluttered, and filthy with at least six cell phones scattered around along

with food containers. And although Mother reported that she cleaned the home and was driving for Uber, Love did not believe that her vehicle could be cleaned quickly. Mother also indicated that she was a sales representative for The Houston Chronicle, Cutco, and Mary Kay, and that she was a dancer but did not want to return to it. Father indicated that he worked in welding, construction, HVAC, heavy equipment work, and a hauling business.

According to Love, Mother and Father appeared to be together at times as they were together a lot, answered each other's cell phones and lived together. However, they also indicated that they were in relationships with other people and not just a couple at times. Love stated that when they were not together, Father was very upset and wanted to be in a relationship with Mother.

Love testified that he spoke with Mother and Father about budgeting, but Father was dismissive of the topic and only worked with him briefly once on that issue. Love would be surprised if Mother or Father used any budgeting information that he had provided to maintain the home. Love stated that he went to their home, a mobile home, but he only saw the kitchen and den. That was the only area that he observed and it looked appropriate. When Love first entered the home, it smelled of spoiled meat. Though he did not see other areas of the home, neither Mother nor Father prevented Love from looking at it. The home had electricity, appeared to have

water, and was tidy. Love indicated that Father presented with "a pretty foul body odor as if he was not bathing, showering, [or] using good hygiene." Father indicated that money for the house came from disability backpay; he was getting a truck repaired and planned to purchase "the fastest production motorcycle that he could buy." Father was often distracted from what Love was trying to accomplish on any subject; Father was very focused on driving a motorcycle 200 miles per hour. When Love urged Father to consider taking care of himself and his family, Father said that he would just get life insurance.

Love testified that Father did not follow through on important tasks like starting substance abuse treatment, but he paid thousands to repair a truck that he never obtained. Father also did not follow through on getting his prosthetic leg fixed so he would not damage his left leg further, which Love addressed with him more than once.

Love stated that he tried to go over anger management with Father, but he could not accomplish it with him. Love further stated that he did not see any changes in Mother's or Father's behavior or maturity levels. Love testified that Mother took accountability once when she indicated that she felt guilty about using drugs with a neighbor. Both Mother and Father made excuses mostly about the condition of the

trailers that they blamed on a flood. Neither Parent took ownership or responsibility for the case with the Department.

Love testified that he observed five one-hour family visits, and half a dozen visits that were five to fifteen minutes. During the sessions, Mother would get James food, drinks, play with him, and hug him. Though the relationship seemed distant, Mother put in a great amount of effort, it just was not reciprocated. This could have been typical behavior of a two-year old. Love did not recall being concerned about what he observed between Mother and James.

Based on Father's years of drug use, Love opined that Father has an addiction. Love indicated that if Mother used drugs since she was teenager, he believed she also has an addiction. Neither has worked through their addiction, and Love stated that it is not safe for the Children to be left in their care if they are still using drugs.

Kelly Kuhn testified that she is a recovery support peer specialist with HEROES, the Houston Emergency Response Opioid Engagement. She testified that she is a woman in recovery and has been sober for six and a half years. This is required to become a peer support specialist, and she also had to take a 56-hour course and do 500 hours. She has been a peer coach for five years and worked with over 1,500 people. Kuhn testified that Mother has been engaged with HEROES since May of the year before and that Kuhn sees Mother at Wednesday group sessions.

Both sessions are virtual though there is an option to attend the individual sessions in person.

Kuhn explained that participants must first admit they have a problem and want help. Participants must then call in and they are screened to confirm if they are a good fit for the program. They are then enrolled and connected to the necessary services.

Kuhn stated that in addition to group therapy, Mother received individual counseling with a licensed counselor, Maria Carballo. Kuhn observed that Mother puts in the work and asks for help when needed. She believes that Mother has been successful in the program. Kuhn testified that as her recovery coach, she believes Mother has made lifestyle changes by attending group sessions, being alert and active in the groups, reaching out and talking to Kuhn, and being employed. Kuhn stated that they do not verify employment and do not conduct drug tests. She was unaware of Mother participating in any other programs. HEROES is not a service the Department provides. Mother can continue to participate in the service beyond the life of the case.

Kuhn testified that Mother spoke to her about Mother's relapse in January, and she increased her treatment services to recover. Kuhn indicated that she does not know if she was informed of Mother's relapse after the Department learned of it.

She is only aware of one relapse. Mother's counselor would discuss a relapse prevention plan with Mother, and to Kuhn's knowledge, Mother is still engaged in counseling and group sessions. HEROES does not offer any other recovery-type services.

Kuhn stated that she believed Mother had the tools to maintain sobriety and the willingness to do so. Mother has been consistent in her participation, and she participated in the weekly sessions. Kuhn acknowledged that the HEROES activity tracker indicated a three-month period that Mother did not attend individual, support group, or educational group sessions. Kuhn confirmed that the activity tracker further indicated that Mother had not been to an individual counselor since September 2024 and that she had not attended individual counseling for approximately nine months. Kuhn agreed that the activity tracker indicated that Mother was consistent in attending education group, support group, and individual counseling from May 30, 2024 through October 2024.

Kuhn testified that Father is enrolled with HEROES but she is not his recovery coach and not permitted to discuss Father.

Kuhn agreed that based on her experience, individuals in recovery should stay away from all substances, including marijuana and alcohol. Kuhn testified that she did not recommend that anyone she is coaching be in a relationship with someone

25

using drugs. Kuhn indicated that notes from HEROES indicate that Mother was drinking, which HEROES knew of.

Grandfather, Mother's father and the Children's maternal grandfather, testified that he is asking for termination of Mother's and Father's parental rights because he believes they have endangered the Children, and it is in the Children's best interest. He stated that he believes the children have suffered and their needs have been neglected.

Grandfather testified that he has had experience with the Department in the past beginning around 1998. He stated that the case involved his ex-wife, Crystal. He testified that he had issues with alcohol and Crystal had issues with drugs. During an argument, Grandfather was accused of assault. Grandfather admitted that he had a drinking problem at one time and was referred to Alcoholics Anonymous ("AA"). He met Crystal through mutual friends that were in the AA program. He indicated that he does not drink at all anymore and does not believe that he has a drinking problem anymore. Grandfather then stated that he is not sober and drinks occasionally but has not had a problem with alcohol since early 2000. He admitted that he pleaded guilty to a Class A misdemeanor in the assault case.

Grandfather then admitted that he was charged with driving while intoxicated in 2002 and 2015. He does not believe that he had an issue with alcohol but only an issue driving with alcohol.

Grandfather testified that although he appreciates the Children's caregivers, and he agrees the Children are settled after experiencing trauma, he would like the Children placed with him. He does not believe that relocating the Children would be detrimental to them despite not seeing James in over a year and only seeing May on Facetime "a few times." Grandfather testified that the caregivers and the Department invited him to see the Children, but he has not.

Grandfather indicated that although Mother had a baby at a young age, he did not know that the alleged father was more than ten years older than Mother. He recalled meeting the alleged father briefly but was unaware that Mother felt traumatized by the alleged father. He indicated that Mother came to live with him towards the end of her pregnancy, but he did not recall telling the Department that May had contact with the alleged father for a year after the birth. He agreed that their age difference made the relationship a crime, and he indicated that he spoke with law enforcement, but the alleged father was incarcerated at the time.

Grandfather testified that he was unaware of the condition of the property that the Children were living in because he was not allowed on the property. He stated

27

that when he would call, Mother would come to the front and that did not concern him. Mother sometimes brought the Children out, and although he noticed that they were a little underweight, he did mention it. The last time he went to the property he brought a generator, but he was still never brought to the trailer. Grandfather indicated that he gave Mother and Father gas money throughout the case, and he believed he may have been funding their drug habit in the past.

Grandfather testified that he does not recall his second or third cases with the Department, but his children were in the Department's custody at one point. His children were initially placed with a maternal aunt, Stephanie Lau, but when she was unable to care for them, the children went into foster care temporarily. Grandfather stated that he took a drug test and got his children back. The children were eight and six at the time.

Grandfather agreed that it would be a concern if the Children were place with people who had a criminal history. He admitted that he attended a court hearing for the case in October, but he kept up with the case through Mother.

According to Grandfather, he first reached out to Aponte, the caseworker, and requested to be considered for placement. Grandfather stated that the Children were with an agency-adoptive family. He stated that he was contacted again and given an incorrect court date.

Grandfather stated that he spoke with the next caseworker, Ms. Brewster, about being a placement for the Children and she explained the Department's approval process. He indicated that he provided the necessary information and the last time he spoke with Brewster was when she conducted a home study. No one from CASA or a third-party contractor conducted an actual home study evaluation, and Brewster did not follow-up with the results from her home study.

After Brewster, Grandfather testified that he spoke with Ms. Callaway about being a placement and about the home study. According to Grandfather, Callaway did not know the outcome of the home study conducted by Brewster, so she conducted another home study. Callaway did not conduct another home study, and Grandfather testified he was never told that the Department denied his home study. Grandfather indicated that he was never told that he could not be a placement for the Children, and he did not follow-up with Callaway. Grandfather said that Mr. Browne came to his home recently and conducted a third home study.

Grandfather testified that although he spoke with Tinlin about visiting May, they never scheduled a specific visit. He stated that they planned a time to see May for her birthday, but he could not make it. He recalled that he and Hailey planned on two occasions to visit with James, but once Grandfather did not go, and the other

29

time Hailey was going out of town. Grandfather did not follow-up to schedule another visit.

Grandfather testified that Mother stayed with him since the removal for four to six weeks at his invitation. Mother later went to stay with a friend because they worked together. Grandfather denied that he kicked Mother out and stated that Mother went to her friend's home on her own.

Grandfather indicated that he celebrated Christmas 2023 with Mother, Father and the Children and that the Children appeared healthy, safe, happy and clean. He stated that Mother and Father looked fine and did not appear to be in the throes of addiction. Grandfather testified that in the Spring of 2024, he became concerned because they came to his home to use his water. He indicated that at times, Mother and Father lived without water or electricity. Grandfather stated that he spoke with Mother and Father about his concerns, and he was told that they were living on the Tinlin's property.

Grandfather reiterated that he does not believe the Children should be returned to Mother and Father. He testified that he feels that Mother and Father need to maintain sobriety for a longer time before James and May are returned to them, but both parents should have contact with James and May if they are doing the right thing. If James and May were in his care, Grandfather stated that he would require

Mother and Father to show proof of sobriety and income to see the Children, and he would monitor the visit. He believed that the same protections should be in place if Tinlin or Hailey have conservatorship of James and May.

Based on his observations of Mother and May, Grandfather testified that they have beautiful interactions, and he has not observed May fearing Mother. He testified that Mother's relationship with James is loving, and he has not observed a situation where Mother did not meet his needs.

Grandfather testified that he last saw Mother with May or James about one year ago, and he had not seen them together during this case. He indicated that he does not know how either child relates to Mother currently. Grandfather admitted that when Mother and Father came to his home to take showers and do laundry, he did not know the situation, although Mother and Father indicated that they did not have water staying on the Tinlin's property. He agreed that Mother and Father had problems paying their bills previously, and it was reasonable to assume they came to him for help and money. Grandfather stated that he did not believe that James and May should live in a situation without water or electricity.

Grandfather admitted that in the past he stated that Tinlin is a good candidate for May if she had to stay with someone but not permanently. Grandfather agreed that Tinlin made it clear that he would never prevent Grandfather from seeing May.

Grandfather admitted that he told Hailey that he wanted James to stay with him, and Hailey has offered him the opportunity to visit James when Grandfather is available. Grandfather agreed that he canceled scheduled visits. Grandfather indicated that he told Hailey that James is thriving in his placement and is better off with Hailey than with Mother at this time. Grandfather acknowledged that he stated that Mother and Father were too busy to discuss James and May, and he preferred that they remain in their current placement. He indicated that in six months, Mother may be able to take the Children and provide a safe, stable environment. He admitted that he does not think Mother has made many sacrifices for James and May, and he believed the caregivers have put the Children's needs above their own. Grandfather testified that he believed the caregivers will do everything to make sure James and May maintain a relationship even though they are living in separate homes if they were to keep them permanently.

Next, Scott Martin, a detective with the Montgomery County Precinct 1 Constable's Office and former patrol deputy, testified that he first became familiar with Father when he charged him with aggravated robbery with a deadly weapon in 2016. Martin indicated that he responded to a robbery and identified Father at the premises as a suspect. After an investigation, Martin testified that he determined Father committed the robbery and he was arrested. Martin indicated that two guns

were recovered from the residence where the robbery occurred, and the District Attorney ultimately accepted the charges against Father. Martin indicated that he did not know the disposition of the case.

Martin recalled that he met Father again in an incident that involved the arrest of a female at an abandoned home known for drug use. He met Father a third time during the incident involving Sergeant Hall.

Beatrice Mendez, a self-employed housekeeper, testified that Mother is her daughter's best friend, and she employed Mother from June 2024 through Christmas to clean houses. Mendez stated that Mother worked three to four days a week and she was paid between $250 and $350 weekly. Mother also lived with her during this time but returned to her father's home in December 2024. Mother did not pay rent but worked in exchange for rent. During the time that Mother worked for her, Mendez testified that Mother consistently showed up for work and that she did not have any customer complaints.

According to Mendez, the Department did not contact her about Mother, but she recalled Mother requesting an employment letter.

Next, Mother testified that James and May are her son and daughter and that Grandfather is her father. Mother admitted that she relapsed on January 10th when she used cocaine. Mother denied using any other drugs or using illegal substances

since then. Mother testified that she has a medical prescription for marijuana called the CUPs system and that her diagnosis of anxiety, depression, and PTSD allows her to get medical marijuana. Mother acknowledged that she has not been diagnosed with PTSD by a physician but that she had a medical prescription for marijuana. Mother indicated that she uses marijuana in the form of edibles to help her sleep. Mother informed Callaway in March of her prescription.

According to Mother, to get the medical marijuana card, she had to schedule a virtual appointment, speak with a physician for approximately thirty minutes to one hour explaining why she thinks she needs medical marijuana. Mother testified that with the card, she can go online or to a dispensary and present the card to obtain it.

Mother admitted that she has a criminal record and certified copies of public records of her criminal history were admitted as evidence. Mother testified that in 2018 she was charged with possession of marijuana but not sentenced. At that time, May was with Mother's family. Mother admitted that she was arrested for possession of a controlled substance, Xanax, but the charge was dismissed because the document indicated that she was convicted in another case. She did not recall if it was part of a plea bargain.

In November 2019, Mother admitted that she was arrested again for possession of marijuana in Montgomery County, and her sentence was imposed in 2020. During this time, May was with her family.

In 2021, Mother was arrested for possession of a controlled substance, amphetamine, but that charge was dismissed because she was convicted in another case in Fort Bend County for criminal trespass. She admitted that she was sentenced to twenty days in jail, and May was with Father during that time.

Although Mother initially testified that she used marijuana on March 27th, the day Father's mother passed away, test results indicated that Mother tested positive for marijuana on March 24, 2025. Mother testified that she used marijuana before Father's mother's passing, but stated there were no other times where she relapsed.

Mother stated that she had been in a mental health facility twice. Mother recalled that she was eighteen during one stay but could not recall her age during the most recent stay. To deal with her mental health, Mother testified that she has removed herself from certain places, is working on things to better herself and set goals. She testified that she is not on any medication except her marijuana edibles.

Mother admitted to physical altercations with Father, but testified that it is rare, and the last incident occurred when they lived in the RVs. According to Mother, Father would break and throw stuff like his earlier testimony of him breaking the

windshield of her car with a hammer. Mother later admitted that both she and Father damaged the RVs and property with hammers but that she was not high, just mad, and the Children witnessed this. Mother further admitted that Father would shoot his weapon and do target practice.

Mother testified that she understood that James's and May's living situation was unacceptable, and their safety was at risk because of their surroundings and Mother's and Father's behavior. According to Mother, she was heavy into her drug use while living on the property, and others living on the property were drug users who introduced her to it. She indicated that once she learned drug users and dealers lived on the property, she could not leave and was ashamed to reach out to her father. Mother denied a history of alcohol abuse and testified that she attended AA with a peer group but not for herself.

Mother indicated that she completed individual counseling with Maria and attended couples counseling with Love. According to Mother, it was only suggested that she attend counseling with Love, but she is back in individual counseling with Maria. Mother testified that she was ordered to complete a psychological evaluation, which she did as part of her service plan. She indicated that she admitted to an issue with alcohol abuse in the evaluation. Notes from Mother's evaluation were read and stated that Mother indicated "that marijuana had been her drug of choice since she

36

was young. However, in 2020 she began to abuse alcohol after her fiancé was killed by a drunk driver." The notes further stated that "she does drink today but it is not binge drinking. She does not drink liquor. She will drink maybe beer. [Mother] reported that between '20-'22, she abused alcohol to drown her feelings, grief about her fiancé and her drinking got to the point where she drank a gallon of whiskey a day." Mother agreed that the admission indicated an alcohol problem. Mother further agreed that she still drinks alcohol, but she does not drink as indicated in the notes. She further acknowledged that although her coach at HEROES advised that if she has an additional problem, it is best not to be around any substances, but she still drinks alcohol occasionally.

Mother agreed that prior to January 2024 and before financial hardships, she was responsible for providing May, as her primary caretaker, meals, homework assistance, medical care, emotional support, a stable home environment, and a nurturing home environment. Mother testified that she provided it all before her financial hardships, but drug abuse played a role. Mother agreed that at the time of removal, she had not provided these essentials for May in months.

Mother agreed that May should have had her medication when she was sick at school. Mother admitted withdrawing May from school shortly after this incident, but she denied knowing that the Department was investigating at that point. Mother

37

testified that when she was contacted by the Department, the family was already in Georgia.

Mother heard and agreed with Grandfather's statement that neither she nor Father are ready and should work on themselves more. Mother testified that at the age of eighteen she was admitted into a psychiatric hospital due to still grieving over her mother's death, which was due to a "potential drug overdose" although her death certificate does not indicate a cause of death. Her mother died when Mother was sixteen, and Mother found her mother's body after not hearing from her for about one month. At the time, May was six months old. Mother testified that when she was eighteen, she had a hard time, went through a lot, and several things were triggers for her. She was in the hospital for three to four days, and May was with Mother's aunt.

Mother testified that the second time she was in the psychiatric hospital was in 2023 while living on Tinlin's property and she voluntarily sought help for her mental state. She explained that at the time they did not have water, so she could not shower, and the electricity was cut off several times causing food to spoil. She remained at the hospital for three days and she was advised to move since where she was living was not best for her mental health. At that time, Mother testified that

James and May were with Father on the property. Mother indicated that they moved that week.

Mother stated that May was prescribed Albuterol for her breathing machine, not an inhaler, when she was younger prior to the emergency room visit. May did not have a prescription for an inhaler. Mother testified that May's breathing machine is possibly in one of the RVs since they moved out quickly. Mother recalled that May was diagnosed with bronchitis at the emergency room and given steroids. Mother indicated that she did get May's prescription for Albuterol either the next day or the day after and May had it with her but only used it a few times. Mother stated that the emergency room did not provide her with any documents to keep May out of school.

Mother testified that the decision to withdraw May and travel across the country was previously planned, and was not decided because the school nurse questioned them about May.

Mother stated that she and Father worked with Love on a budget, and they can support themselves within that budget for their current living conditions. She said that she and Father worked on the budget in the beginning of January, and it was very helpful. Mother indicated that she is ready for James and May to return to her

home today as they have their own rooms, food is in the home, it is a clean environment with water and electricity.

Mother indicated that she is asking that the parent-child relationship not be terminated and to provide a safe environment she will continue in the program working on her goals, and she will continue to work and stay in contact with family who have supported her. She testified that she believed May needed to continue therapy, and that if James needed therapy she would enroll him. To support Father's mental health journey, Mother testified that she would encourage him to continue seeing a therapist. Mother stated that she is not seeking to terminate Father's parent-child relationship with James. Mother testified that before the removal she had never seen a therapist.

Mother stated that she did not have any gummies that morning, and the last time she had a gummy was one or two weeks ago. Mother indicated that she discussed her alcohol use with the Department, and the Department did not have any concerns. She admitted that she should not drink alcohol while in recovery, and it is not a good idea if her coach says it is not, but she stated that she was not told to cease drinking alcohol. Mother admitted that during the case she went to a restaurant with friends, had drinks, and was drugged by a friend. She stated that it was a bad choice, but she never assumed that she would be drugged by a friend.

Mother indicated that she currently works as an assistant manager at Family Dollar; she worked until closing, around 11 p.m. the night before and went to bed around midnight.

Dustin Tinlin, Father's younger half-brother and May's caregiver, testified that he is twenty-three years old and employed with Brush Pro Mulching. He testified that he and Father lived together all their lives until Father went to live with their grandmother at the age of fourteen. He and Father lived together again approximately one month after Father was released from prison. Tinlin testified that he tried to get Father to do good and get him out of a bad area, so he asked that he move in with him.

He indicated that he met Hailey through work, and they have since become good friends. Tinlin testified that he got Father a job with Hailey, and Father did well with Hailey from September 2020 to April 2021. Father eventually moved out and about one month later, in May 2021, he met Mother. Father bought an RV and he and Mother moved it to a childhood friend's house. Tinlin met May in June 2021.

Tinlin testified that in August or September of 2021, he moved in with his parents to help care for his father, and at one point, Mother, Father, and May came to live there also after bouncing around. He stated that he has been Uncle Dustin to May since day one and that they all lived in the same vicinity for three to four

months. He recalled that Father lost his leg in June or early July of 2021, and James was born in September 2022. Tinlin testified that he recalled May being taken out of school and that the Department left a note on his parents' gate. After that, Tinlin indicated that the family left, and at that time James was about seven months old. He indicated that he was told that Father was starting a hotshot business, and the family was gone for four or five months. James was with Father and Mother the entire time.

Tinlin stated that he saw Mother and Father in an altercation at his parents' house eating donuts when Mother and Father began shoving and grabbing each other in the yard. Mother took James from Tinlin's mother and started walking down the driveway and May ran behind her. Tinlin stated that Mother did not stop to check on May but kept walking.

In another altercation, Tinlin testified that Father called him and asked that he come and "stop her beating him." When Tinlin arrived, he stated that Father had marks all over his body, a bite mark, and that Mother and Father were screaming at each other. Tinlin indicated that May reacted by getting violent, throwing a controller at Father's truck, and screaming at Mother and Father.

Tinlin stated that he saw where Mother and Father were living when he received messages from Mother that their camper flooded. Tinlin stated that he arrived at the property and the campers were high on a hill and there was no rising

water. Mother and Father were very active, "hyper," and "all over the place." After their sister, Ashley, spoke to Father, both Ashley and Tinlin left.

Tinlin discussed another incident where Father had an emergency detention order and went to a mental hospital. He was worried about Father, so he went to the property where the RVs were located and spoke with people at the main house. According to Tinlin, the people at the main house seemed like they were on drugs so he went to the area where the RVs were located, and he looked in the kids' RV. He stated that he saw James crying but he did not find May. He later learned that May had put herself on the bus.

Tinlin testified that he then saw Mother wake up and crawl from underneath one of the bunks towards the back of the kids' RV. Mother seemed "very out of it" and she told Tinlin that Father was at the hospital. After seeing all the trash, Tinlin stated that he was very worried, so he went home, called Hailey, and then called the Department. An investigator was at his home within three or four hours and James and May were removed and placed with him.

Tinlin stated that he had a five-month-old daughter at home so to help his wife with May and James, he took off work for two weeks and his grandmother came from Austin to help. Tinlin testified that the Children were first taken to a clinic then brought to his home where they were bathed. Tinlin stated that their clothes were

43

filthy, including the additional clothes, and while the Department provided a few clothes, he purchased more. He then indicated that he was concerned because May was mothering James and would not allow anyone to change his diaper, feed him, and discipline him. May took care of James as if he was her baby.

Tinlin testified that Hailey was very involved, and at one point James and May went to live with him for a few weeks though Tinlin was still involved. He stated that it was determined that James and May were not progressing together, because May wanted to mother James. It was decided that Tinlin would have May stay with him for a few weeks to test out if it would work, and May began to open up, be more playful and behave more like a nine-year-old. He indicated that in addition to him and his wife, his daughter and May reside with him.

Tinlin indicated that at some point he was concerned about a man that knew where James and May were placed and was looking for Mother. According to Tinlin, the man was looking for Mother because he alleged that Mother had withdrawn money from his account, and she was driving a vehicle paid for by the man. The man contacted Tinlin's mother, Father, and Mother. Tinlin stated that he spoke with Mother about the situation briefly.

Tinlin recalled speaking with Mother in October where she admitted to using drugs and partying. Mother indicated that her friend and her friend's boyfriend

drugged her, stole from her, and that she woke up in a hotel with nothing. Tinlin stated that Mother did not know what drugs they were doing together.

Tinlin indicated that he spoke with Grandfather and offered him visits with May, but he has never come. Tinlin testified that he wanted to adopt May, and he thinks that Mother and Father should see James and May when they "clean up and become an example." Tinlin indicated that he believed it is important for May to have a relationship with Mother. He stated that his wife, Krista, is May's best friend and full-time caregiver since he works a lot. He admitted that Krista takes May to 90% of her doctors' appointments but that he takes her also. He indicated that May is in therapy again after finding a new therapist because she did not like the prior therapist. He testified that he could provide May with a stable home and will love her forever.

Tinlin indicated that he never used marijuana with his brother-in-law, but he used marijuana with Father in 2022 or 2023. He recalled buying marijuana from Father back in 2022 or 2023 also. He testified that his wife smoked marijuana with Father long before she was pregnant when they were nineteen or twenty years old.

Tinlin testified that when Mother and Father lived on his parents' property, Mother and Father smoked and sold marijuana. While living on the property, Tinlin indicated that the RV only had electricity and septic, but did not have running water.

Tinlin stated that Father smoked around James and May when they lived on his parents' property. Tinlin testified that the first time he went inside the RVs was the day that he called the Department. He noticed that the RV had a propane tank in the living room, it smelled, the floor was rotten, and it was very dirty.

Tinlin indicated that he met with the school nurse, and she now has an action plan and May's inhaler at school. Tinlin stated that May had a birthday in December, and he begged Grandfather to come. Grandfather did not come and told Tinlin he was moving. Tinlin indicated that he did not know Grandfather prior to the case, but Grandfather has had Tinlin's contact information since the beginning of the case. May is up to date on her medical needs and has not been sick other than a few colds and her asthma is being maintained.

Tinlin testified that he is asking the jury to terminate Mother's rights to May, and he is asking to be able to adopt her. He stated that he has taken a drug test during this case, and he has one arrest on his criminal history for a class A assault that occurred when he was eighteen. Tinlin admitted that he allowed Father to see May once on the day after his mother's funeral, which was not authorized by the Department.

David Hailey, Father's former employer and friend, testified that he lives in a house with his girlfriend, daughter, and James. He stated that Father has worked for

him off and on since 2020 with the last employment being two months ago. Father performed odd job work for him like cutting grass and trash removal. During this case, Hailey testified that he helped Mother and Father locate and fix a vehicle. When the Children were first removed and in the Department's custody, Hailey indicated that he bought both Mother and Father phones to communicate with the Department because neither had a working phone.

Hailey indicated that he did not intend at the beginning to have James in his care permanently, and he prayed that they would "get their act together and get [James] back." Hailey testified that he first met Father shortly after he got out of prison, and Father worked for Hailey full-time for almost two years. Hailey stated that Father quit working for him shortly after Father met Mother, and Hailey fussed at him regularly for coming to work with the strong odor of marijuana. He then saw Father again around Halloween after his accident. At that time, Father was in a wheelchair, and Hailey gave him work around his shop. He testified that he next saw Father after James was born and May worked the haunted woods dressed as a vampire to scare people.

Hailey indicated that he first babysat James in December 2023 after Mother and Father got into an argument, and Mother dropped James and Father at Hailey's house. Hailey testified that the first thing he did was put James in the tub and cleaned

47

him. Hailey indicated that James did not have any diapers, wipes, or bottles and his fingernails and toenails were black. Father was with James the first day but then someone picked Father up, and three days later both Father and Mother returned to get James. Hailey did not recall where Mother and Father said they had been. Hailey indicated that he assumed Father would return the next day, but he was not sure. Hailey stated that his girlfriend works from home, and she could watch James. Hailey further indicated that Grandfather stated that Mother would do the same with May when she was younger.

Hailey stated that when Mother and Father left on the road trip, he prepaid for a hotel room for the family and paid for a wrecker to get Father's broken truck towed off the road to the hotel. Hailey recalled speaking to Tinlin when the Department removed the Children, and Tinlin was worried about Father hurting himself or dying. Hailey stated that he went to the RVs to see the living conditions, and it looked as it did in the video. Hailey indicated that he spoke with Father after the Children were removed and Father and Mother had resentment towards Tinlin for calling the Department. Hailey testified that James eats fast as if he is not going to get another meal sometimes causing him to choke. Hailey admitted that Father eats the same way though. Father admitted that if James and May were alone in the camper and May did not know what to do if James choked, it could have been dangerous. Hailey

testified that he observed the same behavior of May parenting James that Tinlin detailed in his testimony.

Hailey stated that when the Children were initially removed, James had staph, and both had lice. Hailey testified that the Department gave James a birthday party and he identified photos of James, May, Mother and Father, along with other photos of James getting a haircut and visiting the zoo and a carnival. Hailey admitted that he still communicates with Mother and Father, but he does not think they are safe to have James and May right now. Hailey indicated that Father did not believe that Mother would remain sober once "all eyes are off of him and [Mother]." Father then admitted that he would probably not stay sober if Mother was not.

Hailey testified that he is asking that Mother's and Father's parental rights to James be terminated and that termination is in the best interest of James. Hailey indicated that he wants to adopt James. Hailey stated that he has spoken with and invited Grandfather to family functions, but he has never come. James is cared for by Hailey and his girlfriend and does not attend daycare. He described James as a rambunctious two and half year old who likes to eat, play, watch Ms. Rachel and learn. Hailey stated that May seems happy and healthy with Tinlin and she has self-esteem now which she lacked when she was first removed. He intends to maintain

the relationship between May and James if he and Tinlin get the Children. He acknowledged that he would work with Grandfather to visit James.

Next, Debra Callaway, a conservatorship caseworker for the Department, testified that her job duties include ensuring the children are in a safe environment where they are cared for, their needs are being met, and they are receiving necessary services. Callaway indicated that she also works with the parents to obtain the resources needed to address the Department's concerns and track their progress. Callaway stated that she must also communicate her observations and information to her supervisor, legal team, and relevant parties. The first goal is typically family reunification. She indicated that if that changes, they start working towards other goals, but they must have a plan by the end of the case which typically has a dismissal date approximately one year after a removal.

Callaway stated that she became involved in this case on September 3, 2024, and both Mother and Father had court-ordered service plans. Callaway indicated that substance abuse is included in the service plans and that she does not believe Father completed his substance abuse based on the testimony, her observations when she spoke with him, and from the providers. While Mother and Father completed the ordered psychological evaluations, the service plan requires that they follow the recommendations of the evaluations. According to Callaway, Mother's evaluation

recommended parenting classes and that Mother continue the substance abuse treatment program that included group therapy twice a week, plus individual substance abuse therapy and mental health individual therapy. Callaway stated that she does not believe Mother completed individual therapy.

Callaway testified that she does not believe that Mother and Father have stable housing because initially they were not together, but they began living together toward the end of fall. Callaway stated that their living situation became more consistent early that year. Callaway indicated that she was told that they could afford their new location because Father received social security disability, and in addition to a monthly payout, he received lump sum back pay. Father also does odd jobs, and Mother has a job with DoorDash and started working as an assistant manager at Family Dollar two to three weeks prior. Callaway stated that she received a copy of the lease and it was written on notebook paper. She indicated that she has concerns about their housing because shortly after they moved in, Father was picked up during an immigration raid on the property.

Callaway described May as a bright-eyed, spunky ten-year-old who's enjoying her time with the friends she has made at school. She is very bright and outgoing and loves to play with Tinlin's daughter who she calls "Sissy." May is also described as a very strong self-advocate. Callaway described James as "always just

51

a happy little boy[]" who loves to learn and listen. She stated that when she sees him, he has learned a new letter or sound or can count further, and he loves to interact with people.

Callaway testified that part of her job is meeting with the children privately at least once a month. Callaway recalled that she met May on September 5, 2024, for the first time and May made several concerning statements. According to Callaway, May first described herself as, "I guess I'm like [James]'s mom[]" and she mentioned that she and James spent most of their time in one trailer and that Mother and Father spent most of their time in the other trailer. May told Callaway that she had to be brave for James and that she was left a gun for safety in case someone tried to break in. May indicated that the pistol was left in a cabinet where she could reach it, but James could not. Callaway stated that May said that she would go to bed hungry two or three nights a week or just have Ramen noodles and James would have a bowl of cereal.

Callaway testified that the main progress that she has seen in May is her demeanor because she now bounces around when they speak, she allows Callaway to look over her shoulder while they talk if she is on her tablet, and she is very open compared to when May would sit across the bed, against the wall, with a pillow against her. A summary of May's school records that Callaway prepared was

admitted as evidence. Callaway indicated that the information included was where May was living, absences, nurse notes, grades, and additional information that was noteworthy.

Callaway stated that May and James were already separated when she got involved in the case, but the Department tries to keep siblings placed together, if possible. She indicated that it is also the policy to consider and do what is best for the child. Callaway stated that she agrees with how May and James are currently placed. When she first got involved, the goal was family reunification and at that time Tinlin and Hailey did not want to adopt. Both caregivers wanted to care for James and May, provide for their needs, and give Mother and Father time to address their issues to get them back. As a caseworker, Callaway stated that she must work on the primary goal of family reunification but also have a backup concurrent goal where the Children can go long term and permanently if they cannot go home with their parents. Here, Callaway indicated that she began to look at relatives for placement including Mother's maternal aunt, Grandfather, Father's full and half-sisters, and she attempted to speak with Mother's sister.

Callaway testified that Mother's maternal aunt was four hours away, and when Callaway followed up on a previously denied home study at Grandfather's home in October, where she noticed that Mother still had items at the home and was

living there. According to Callaway, after speaking with Grandfather's wife, she believed that it was their desire for James and May to remain in their current placements. By January, both Tinlin and Hailey expressed their desire to adopt May and James.

Callaway testified that the Department is asking to terminate the parental rights of Mother and Father and to place May and James with Tinlin and Hailey so they can be adopted. Callaway stated that if Mother's and Father's parental rights are terminated, the Department becomes the permanent managing conservator. During that time, the Department will assist Tinlin and Hailey with adoption preparation to get May and James adopted.

Callaway testified that Mother's service plan required that she obtain stable income. According to Callaway, when she first got involved, Mother was cleaning houses for employment for Mendez, and Mother did this through most of the fall. Callaway could not verify the employment because Mother failed to provide letters, and Callaway did not reach out to Mendez. Mother began working for DoorDash in October and into 2025. Callaway indicated that Mother tried to work for an online business but quit and eventually started working at Family Dollar approximately three weeks prior. Mother provided Callaway with her letter of acceptance with Family Dollar and she has been receiving income.

Callaway stated that she got varying stories on where Mother was living through December 2024, and although Mother told her about the property where the Children were removed, Mother never told Callaway the specific reason she left the property. According to Callaway, Mother did not tell her that she left the property because it was inappropriate to return the Children there. Mother informed Callaway that she did not intend to have May and James returned to her while she stayed with a friend.

Callaway indicated that Mother did complete a housing application in September. Callaway explained that if there is an intention to return the children to the home, the Department can bump up the application, but nothing stops a parent from applying on their own and getting on the waitlist. Callaway further explained that the Department would not push an application through unless a monitored return home was approved. Callaway testified that he visited the current home that Mother and Father share, and it was clean, free of hazards, and appropriate. Callaway agreed that while the housing is safe, the stability is still to be seen though they have maintained it for three and a half months.

Callaway agreed that Mother has participated in drug testing when requested by the Department except for one time. At the time, Mother refused a hair follicle test because she stated that it violated her religious beliefs. Callaway indicated that

the Department considers HEROES a valid substance abuse treatment program, and Mother has completed and satisfied the substance abuse treatment program requirement. Callaway verified Mother's reengagement with HEROES after her January relapse, but she is unsure if Mother completed her individual counseling through HEROES. Callaway stated that she received confirmation from HEROES that Mother completed her substance abuse treatment and individual therapy. It is the Department's position that Mother did not do individual mental health therapy with HEROES since HEROES is a research program for addressing opioid and substance abuse. Callaway testified that she explained to Mother that HEROES therapy was insufficient for the Department to accept, and this is why Mother was doing therapy with Love. Callaway agreed that Mother completed parenting classes. Although Mother reenrolled in HEROES for her substance abuse treatment, she has partially continued with the treatment because communications with Maria Carballo indicated that Mother was not engaging in all portions of the program on April 14th. Callaway agreed that someone from HEROES might have testified differently the day before.

Callaway stated that Mother had supervised visits with James and May once a week for approximately one hour. Mother brought food and supplies to take care of the children during the visits and when advised to bring foods with less sugar,

56

Mother corrected it. During the visits, Callaway stated that Mother engaged with James and May appropriately and there were no physical safety concerns.

Callaway stated that aside from completing individual therapy, Mother was still required to demonstrate stable income, the ability to maintain the home for an extended period, continue individual mental health therapy and continue to address her relapse. Callaway agreed that Mother has made progress by finding a place to live, gaining employment and purchasing a vehicle. Callaway stated that observation-wise, Mother appears more stable now than at the time of removal, and the Department's concern is her ability to maintain that.

Regarding Father, Callaway testified that she met with him monthly and discussed his family plan, progress on his services and getting back into substance abuse treatment. Callaway stated that she was told that Father enrolled with HEROES. Callaway agreed that Father's service plan stated that he needed stable housing, and he has a home that he has lived in since January. Callaway stated that Father submitted to random drug tests and completed his parenting class and psychological evaluation, but inconsistently participated in individual therapy with Love.

According to Callaway, Father visited James at the Department's office once a week for approximately one hour. Father brought snacks for James and the

appropriateness of the snacks was addressed once. Callaway indicated that James and Father were engaged for the most part, and she did not have any physical safety concerns for James.

Callaway testified that the Department investigated people that lived on the caregivers' property, and a safety plan was put in place that May is not to be alone with Kenneth Wilson nor is he allowed to be around May if he appears to be under any influence. This stems from a 2018 charge, and the parents having issues with him.

Since her placement with Tinlin, Callaway had not had concerns about May's grades, attendance, or emotional safety. Callaway indicated that she did have concerns about May's emotional safety during visits with Mother because at times things were said to May that upset her. Callaway believed that Tinlin has answered May's questions about the case with age-appropriate language. Callaway believed that Mother has discussed the case with May during visits.

Callaway testified that the goals changed in this case in December because Mother and Father still did not have stable housing, stable income, Father was not engaged in substance abuse treatment, and some drug test results were concerning.

Next, Bryan Johnson, guardian ad litem for May and James, testified that he is a volunteer appointed by a Judge to look after the child's best interest and ensure

the Department, caregivers, and parents are doing what they are supposed to do so a final recommendation can be made in the best interest of the child. Johnson testified that it is his recommendation to the jury that the parents' rights be terminated and that May and James are adopted by their current caregivers. He explained that he looked at the *Holley* factors to determine the best interest of the Children and that the *Holley* factors that favor termination in this case include the desires of the Children, the current and future needs of the Children, the current and future potential of danger for the Children, stability of the home, and plans of the parents for the child's future.

Johnson explained that he has met both caregivers and has no concerns. Johnson testified that he met Kenneth Wilson, and he has no concerns about him either.

Johnson testified that he met with Mother in late fall about her plans if James and May are returned home, and Mother did not have a distinct plan but referenced different programs that were available. Johnson did not agree that Mother's situation had changed drastically. Johnson agreed that Mother had a home, and the caseworker assessed the home and told him it was safe and clean. He indicated that he was told that Mother started a full-time job a few weeks ago, but he had not talked with

Mother about her future plans and how she would care for the Children if they were returned to her.

Johnson testified that he spoke with Father about his future plans on how he would care for the Children, and he did not provide any specific information. He indicated that he last spoke with Father via text approximately one month ago.

Johnson indicated that he has been on this case since the very beginning and that he had been seeing the Children monthly. He stated that he has seen changes since they first came into the Department's care and that those changes weighed in on his decision and recommendation. Johnson testified that he also observed visits between the parents and the Children and had visited the home of the caregivers. Johnson also reviewed school and medical records and had spoken with May and James. Johnson testified that all those factors weighed into his decision and recommendation.

Johnson stated that he learned Father leased a new home and he attempted to see the home but was unsuccessful.

Christina Nordstrom, CASA advocate, testified that she agreed with Johnson's recommendation for similar reasons. Nordstrom stated that she had observed May in the Tinlin's home, and she had no concerns of Tinlin or his wife

caring for May. Nordstrom testified that she had no concerns about Hailey's wife and James either.

Nordstrom indicated that she last communicated with Mother in December. Nordstrom last communicated with Father in December also.

Nordstrom testified that she believed she had built a sufficient relationship with May to understand her desires. Nordstrom agreed that those desires played a factor in her decision and recommendation. Nordstrom recommended to the jury that parental rights to May be terminated and that May live with and be adopted by her caregivers. Nordstrom testified that it is in the best interest that parental rights to James be terminated and that he be adopted by his caregivers. Nordstrom further stated that separation of James and May is in their best interest, and through her involvement she is aware that the caregivers have arranged for visits roughly every two to three weeks.

At the conclusion of trial, the jury answered "yes" to the following questions:

Question No. 1
Do you find by clear and convincing evidence that [Mother] has knowingly placed or knowingly allowed the child to remain in the conditions or surroundings which endanger the physical or emotional well-being of the child?
Answer as to [May]: Yes
Answer as to [James]: Yes

Queston No. 2

Do you find by clear and convincing evidence that [Mother] has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child?

Answer as to [May]:     Yes
Answer as to [James]:    Yes

Question No. 3

Do you find by clear and convincing evidence that [Mother] has used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a control substance?

Answer as to [May]:   Yes
Answer as to [James]: Yes

Question No. 4

Do you find by clear and convincing evidence that termination of the parent-child relationship between [Mother] and the child is in the best interest of the child?

Answer as to [May]:   Yes
Answer as to [James]: Yes

Question No. 5

Do you find by clear and convincing evidence that the Department made reasonable efforts to return the children to [Mother] and despite those efforts, a continuing danger remains in [Mother's] homes?

Answer as to [May]:   Yes
Answer as to [James]: Yes

Question No. 6

Do you find by clear and convincing evidence that [Father] has knowingly placed or knowingly allowed the child to remain in the conditions or surroundings which endanger the physical or emotional well-being of the child?

Answer as to [James]: Yes

Question No. 7
Do you find by clear and convincing evidence that [Father] has engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child?
        Answer as to [James]: Yes

Question No. 8
Do you find by clear and convincing evidence that [Father] has used a controlled substance, as defined by Chapter 481, Health and Safety Code, in a manner that endangered the health or safety of the child, and (1) failed to complete a court-ordered substance abuse treatment program; or (2) after completion of a court-ordered substance abuse treatment program continued to abuse a control substance?
        Answer as to [James]: Yes

Question No. 9
Do you find by clear and convincing evidence that termination of the parent-child relationship between [Father] and the child is in the best interest of the child?
        Answer as to [James]: Yes

Question No. 10
Do you find by clear and convincing evidence that the Department made reasonable efforts to return the children to [Father] and despite those efforts, a continuing danger remains in [Father's] homes?
        Answer as to [James]: Yes
…
Question No. 11
Who should be appointed managing conservator of [May]?
a. [Grandfather]
b. The Department []
        Answer: B

Question No. 12
Who should be appointed managing conservator of [James]:
a. [Grandfather]

b. The Department []
       Answer: B

This appeal followed.

## Mother's Continuance Challenge

In her first issue, Mother argues that the trial court committed reversible error in denying her Motion to Retain on the Docket and Set New Dismissal Date. According to Mother, extraordinary circumstances warranted additional time to complete her recommended services and maintain stability. Mother argues that she was employed, sober, and had obtained suitable housing ready for the Children's return but ran out of time to demonstrate her continued progress and stability. Additionally, Mother argued May was re-enrolled in therapy, and Mother needed additional time to attend therapeutic visits with May at the appropriate time.

"We review a trial court's decision to grant or deny an extension of the dismissal date under the abuse of discretion standard." *In re L.W.R.L.*, No. 09-24-00256-CV, 2025 WL 242937, at *12 (Tex. App.—Beaumont Jan. 16, 2025, pet. denied) (mem. op.) (citations omitted); *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied) (en banc op. on reh'g). A trial court abuses its discretion when it acts unreasonably or arbitrarily, or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241-42 (Tex. 1985). "We may not substitute our judgment for the trial court's

64

judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion." *See Zagorski v. Zagorski,* 116 S.W.3d 309, 313-14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (citing *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002)) (discussing abuse of discretion in the context of marital property division).

Mother argues that she needed time to demonstrate her progress and stability and to attend therapy, at an appropriate time, with May to address their issues. However, it is insufficient to simply assert that a parent needs more time to complete a family service plan when the parent has had sufficient opportunity to perform the service plan but failed to do so. *In re J.D.L.R.,* No. 04-11-00774-CV, 2012 WL 1364988, at *1 (Tex. App.—San Antonio Apr. 18, 2012, no pet.) (mem. op.). Mother had almost a year to complete her service plan. The Department developed a family service plan for Mother in June 2024, and final trial commenced in May 2025. The record shows that although Mother completed portions of her family service plan, she failed to complete all the requirements of her plan, including maintaining consistent employment, providing stable housing, and completing individual mental health therapy. That said, the record shows that Mother's failure to complete her family service plan was not submitted to the jury, nor was it a finding at trial used to support the termination order.

We cannot say the trial court erred in denying Mother's Motion to Retain on the Docket and Set New Dismissal Date nor that Mother was harmed by its denial where the purported need for an extension was to complete a service plan when her failure to do so was not submitted to the jury. Mother failed to demonstrate sufficient cause for the trial court to grant her motion. We overrule Mother's first issue.

## Extension and Severance Challenge

Next, Mother challenges the trial court's granting of May's Alleged Father's Motion for General Extension and to Set New Dismissal Date and the Department's oral request to sever its pleadings as to May's Alleged Father. Mother argues that when seeking to terminate the rights of both parents in a suit involving the same child, the proper procedure is to try the cases together. She contends that severance is appropriate if the controversy involves two or separate and distinct causes of action. Mother asserts that her and the Alleged Father's claims are interwoven, involve the same facts and issues, and the evidence supporting termination of her parental rights is the same as the Alleged Father. According to Mother, any extension or severance should have been granted as to both.

Rule 41 provides that "[a]ny claim against a party may be severed and proceeded with separately." Tex. R. Civ. P. 41. This rule grants the trial court broad discretion in the matter of severance and consolidation of causes. *Guar. Fed. Sav.*

66

*Bank v. Horseshoe Operating Co.,* 793 S.W.2d 652, 658 (Tex. 1990) (citation omitted); *In re E.A.G.,* 373 S.W.3d 129, 148 (Tex. App.—San Antonio 2012, pet. denied). The trial court's decision to grant a severance will not be reversed unless it has abused its discretion. *See Horseshoe Operating Co.,* 793 S.W.2d at 658; *In re E.A.G.,* 373 S.W.3d at 148. A claim is properly severable if (1) the controversy involves more than one cause of action, (2) the severed claim is one that would be the proper subject of a lawsuit if dependently asserted, and (3) the severed claim is not so interwoven with the remaining action that they involve the same facts and issues. *See Horseshoe Operating Co.,* 793 S.W.2d at 658; *In re E.A.G.,* 373 S.W.3d at 148.

Again, this case began in May 2024 and that same month, the trial court set the case for trial for April 16, 2025. At the time, May was nine years old. The record indicates that in December 2024, the Department filed its First Amended Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship and named Alleged Father as the alleged father of May. Soon after, the trial court received a letter from the Alleged Father that indicated he was incarcerated for a five-year sentence for evading arrest and had a discharge date of March 2027. Alleged Father requested a DNA test to determine May's paternity. In January and February 2025, Orders for Genetic Testing were entered. In March

2025, DNA results were filed that indicated that Alleged Father's probability of paternity was 99.9%. That same month, Mother filed her Demand for Jury Trial, and the trial court reset the trial date to May 5, 2025, due to Mother's request.

On May 2, 2025, Alleged Father filed his Motion for General Extension and to Set New Dismissal Date. In the Motion, Alleged Father stated that he was not included in the case until the Department filed its Amended Petition on December 6, 2024, a family service plan was not developed until February 6, 2025, and that it was not confirmed that he was May's father until March 20, 2025, when DNA test results were received by the Department and filed with the Court. Alleged Father requested that the Court retain the suit for a period not to exceed 180 days past the dismissal date.

During pretrial proceedings, the Department orally requested that the Court sever Alleged Father's termination suit. The trial judge found that extraordinary circumstances existed and granted the Department's request to sever termination of Alleged Father's parental rights. The trial court set a new dismissal date based on the delay in locating and serving Alleged Father and the fact that the DNA testing results were not revealed until March 2025. The trial judge set Alleged Father's new dismissal deadline on November 15, 2025, with permanency hearings on June 12, 2025, and October 2, 2025. Final trial for Alleged Father was set for October 29,

2025. The trial court also noted that there "are entirely different facts and legal issues regarding [Alleged Father], especially in light of the fact that he has not even been adjudicated." Considering Alleged Father's delay in being served and establishing paternity, we cannot say that the trial court abused its discretion in severing the termination of Alleged Father's parental rights to May and in granting Alleged Father's Motion for General Extension and to Set New Dismissal Date. *See Horseshoe Operating Co.*, 793 S.W.2d at 658; *In re E.A.G.*, 373 S.W.3d at 148. Additionally, Mother has failed to demonstrate harm that resulted from Alleged Father's severance and extension. Mother's second issue is overruled.

**Best Interest Challenge**

We review cases involving termination of parental rights under a clear and convincing standard of proof, which is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. §§ 101.007, 161.001(b); *In re E.N.C.,* 384 S.W.3d 796, 802 (Tex. 2012) (citing *In re J.F.C.,* 96 S.W.3d 256, 263 (Tex. 2002)) (other citations omitted). To terminate a party's parental rights, the trial court must find, by clear and convincing evidence, (1) that one of the statutory grounds support termination, and (2) that termination is in the best interest of the child. *See* Tex. Fam. Code Ann. § 161.001(b)(1), (2). Here,

Mother and Father only challenge the trial court's finding that termination was in the best interest of May and James.

In a factual sufficiency review, the inquiry is whether the evidence, viewed in a neutral light, "is such that a factfinder could reasonably form a firm belief or conviction about the truth of the …allegations." *In re C.H.,* 89 S.W.3d 7, 25 (Tex. 2002); *In re J.L.B.,* 349 S.W.3d 836, 846 (Tex. App.—Texarkana 2011, no pet.). If, in weighing disputed evidence, the factfinder could have reasonably resolved the conflicts to form a firm conviction that the allegations constituting the grounds for termination were true, then the evidence is factually sufficient, and the termination findings must be upheld. *See In re J.F.C.,* 96 S.W.3d at 266.

"In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* In a legal sufficiency review, we give deference to the factfinder's conclusions and assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder should. *See id.*

"There is a strong presumption that preservation of the conservatorship of the parents is the paramount means to serve a child's best interest; however, clear and convincing evidence to the contrary may overcome the presumption." *In re K.S.,* 420

70

S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.) (citing *In re R.R.,* 209 S.W.3d 112, 116 (Tex. 2006) (per curiam)) (other citation omitted); *see also* Tex. Fam. Code Ann. § 153.131(b). In deciding whether termination is in the best interest of the child, the trial court may consider this nonexclusive list of factors:

> (A) the desires of the child; (B) the emotional and physical needs of the child now and in the future; (C) the emotional and physical danger to the child now and in the future; (D) the parental abilities of the individuals seeking custody; (E) the programs available to assist these individuals to promote the best interest of the child; (F) the plans for the child by these individuals or by the agency seeking custody; (G) the stability of the home or proposed placement; (H) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (I) any excuse for the acts or omissions of the parent.

*Holley v. Adams,* 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *K.S.,* 420 S.W.3d at 855 (citation omitted). It is unnecessary to prove all these factors as a condition precedent to parental-rights terminations. *C.H.,* 89 S.W.3d at 27.

At trial, the jury heard evidence that Mother (1) continued to use drugs throughout the case, (2) continued to drink alcohol throughout the case, (3) failed to complete her Family Plan of Service, including individual mental health therapy, (4) refused to submit to a requested drug test, (5) left May and James unsupervised with access to a firearm, (6) failed to provide adequate medical care for May and James, (7) failed to maintain stable employment, and (8) that May and James were in a long-

term placement with a relative and a close family friend who were meeting their needs and providing a consistent and drug-free home.

The jury heard evidence that Father (1) continued to use drugs throughout the case, (2) failed to complete his Family Plan of Service by receiving and completing the recommended therapy and treatment, (3) was arrested during the case for assault, (4) failed to maintain employment, and (5) that James was in a long-term placement with a close family friend who was meeting his needs and providing a consistent and drug-free home. The jury considered Callaway's testimony that it is in the Children's best interest that Mother's and Father's parental rights be terminated because of their continued drug use and failure to maintain stable employment and housing and failure to successfully complete the recommended treatment and services including substance abuse treatment, individual therapy, and individual mental health therapy. While the jury heard testimony that Mother and Father were living in a mobile home, they had only begun living in the mobile home a few months prior. The jury heard that Father was only able to lease the mobile home after receiving a lump sum of backpay in social security disability and was now receiving monthly payments. The jury heard testimony that Mother was working but that she had only started the job approximately three weeks earlier and this was after several short-term jobs. The jury further heard testimony regarding their continued drug use and of Father's arrest

72

for assault during the case. The jury also heard Callaway and Nordstrom testify that the children were happy and should remain in their current placement.

As the sole judge of the witnesses' credibility and the weight to be given to their testimony, the jury could reasonably conclude that termination of Mother's and Father's parental right is in the best interests of May and James. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a); *see also In the Int. of J.F.C.,* 96 S.W.3d at 266; *Holley,* 544 S.W.2d at 371–72.

We conclude that the Department established, by clear and convincing evidence, that termination of Mother's and Father's parental rights is in the best interest of May and James. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We overrule Mother's third issue and Father's sole issue.

**Appointing of the Department as Permanent Managing Conservator**

In her fourth issue, Mother argues that it was error to appoint the Department as permanent managing conservator of the Children because the Department did not offer evidence of any specific actions or omissions of Mother that demonstrate an award of custody to her would result in physical or emotional harm to the Children. Mother argues that no evidence was presented, and the jury did not make a specific finding to justify the Department's appointment.

Conservatorship determinations are subject to review for abuse of discretion. *In re J.A.J.,* 243 S.W.3d 611, 616 (Tex. 2007). We will reverse the trial court's appointment of a managing conservator only if we determine it was arbitrary or unreasonable. *See id.*; *In re E.G.P.*, No. 09-22-00330-CV, 2023 WL 4013306, at *11 (Tex. App.—Beaumont June 15, 2023, pet. denied) (mem. op.). The Family Code creates a rebuttable presumption that a parent will be named the child's managing conservator unless that court finds that such appointment would not be in the best interest of the child "because the appointment would impair the child's physical health or emotional development[.]" Tex. Fam. Code Ann. § 153.131(a). The finding was made by the jury in this case when it determined that Mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the Children, and that Mother engaged in conduct or knowingly placed the Children with persons who engaged in conduct with endangered the physical or emotional well-being of the Children.

"When the parents' rights have been terminated, Family Code section 161.207(a) governs the appointment of a managing conservator." *In re E.G.P.*, 2023 WL 4013306, at *11 (citing Tex. Fam. Code Ann. § 161.207(a)) (other citation omitted). Section 161.207(a) provides, "If the court terminates the parent-child relationships with respect to both parents or to the only living parent, the court shall

appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code Ann. § 161.207(a). Here, Mother's parental rights to James and May were terminated, as such, we cannot conclude, as to Mother, that the trial court abused its discretion by appointing the Department as the Children's managing conservator. *See In re J.A.J.,* 243 S.W.3d at 616; *In re E.G.P.*, 2023 WL 4013306, at *11.

We overrule Mother's fourth issue.

## Conclusion

Having considered and overruled all of Mother's and Father's issues on appeal, we affirm the trial court's decree of termination.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on October 21, 2025
Opinion Delivered December 11, 2025

Before Golemon, C.J., Johnson and Chambers, JJ.